No. 22-10027

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES,
*Plaintiff-Appellee,*
v.
CHRISTIAN ALEJANDRO ESTRELLA,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:19-cr-00517-WHO-1
Hon. William Horsley Orrick

## BRIEF OF *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION FOUNDATIONS OF NORTHERN CALIFORNIA, SOUTHERN CALIFORNIA, ALASKA, ARIZONA, HAWAI'I, MONTANA, NEVADA, AND OREGON AND THE CENTER ON RACE, INEQUALITY, AND THE LAW AT NEW YORK UNIVERSITY SCHOOL OF LAW IN SUPPORT OF APPELLANT'S PETITION FOR *EN BANC* AND PANEL REHEARING

Shilpi Agarwal (Cal. Bar #270749)
    sagarwal@aclunc.org
Lily Moore-Eissenberg[1]
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
(415) 621-2493

*Counsel for Amici American Civil
Liberties Union Foundations*

Jason D. Williamson (NY Bar #4645529)
    jason.williamson@nyu.edu
Vincent M. Southerland (NY Bar #4579413)
    vincent.southerland@nyu.edu
CENTER ON RACE, INEQUALITY, AND THE LAW
AT NEW YORK UNIVERSITY SCHOOL OF LAW
139 MacDougal Street
New York, NY 10012
(646) 269-3933

*Counsel for Amicus Center on Race,
Inequality, and the Law*

[1] Intern attending Yale Law School

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(a)(4)(A) of the Federal Rules of Appellate Procedure, amici curiae state that they do not have a parent corporation and that no publicly held corporation owns 10 percent or more of their stock.

Pursuant to Federal Rule of Appellate Procedure Rule 29(a)(4)(E), amici curiae also certify that no person or entity, other than amici, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part.

Date: August 23, 2023  */s/ Shilpi Agarwal*
         Shilpi Agarwal (Cal. Bar #270749)
         AMERICAN CIVIL LIBERTIES UNION
         FOUNDATIONS

         *Counsel for Amici American Civil Liberties Union Foundations*

Date: August 23, 2023  */s/ Jason D. Williamson*
         Jason D. Williamson (NY Bar #4645529)
         CENTER ON RACE, INEQUALITY, AND THE LAW
         AT NEW YORK UNIVERSITY SCHOOL OF LAW

         *Counsel for Amicus Center on Race, Inequality, and the Law*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS ................................................................... ii

TABLE OF AUTHORITIES ................................................................ iii

STATEMENT OF INTEREST ................................................................1

INTRODUCTION ........................................................................2

ARGUMENT ............................................................................4

    I.    The Probable Cause Standard Will Erode Civil Liberties
        for Everyone. .....................................................................4

        A.    The Panel Opinion Dramatically Expands the
            Circumstances Under Which Police Can Conduct
            Suspicionless Searches.............................................................5

        B.    The Expanded Scope of Parole Searches Will Erode
            Civil Liberties for Former Parolees, Third Parties,
            and Entire Communities. .........................................................8

    II.    The Standard Will Disproportionately Harm People of Color............11

        A.    The Panel's Standard Will Exacerbate Racial
            Profiling in Policing.............................................................12

        B.    The Standard's Spillover Effects Will Have
            Compounding Impacts on Already-Overpoliced
            Communities of Color............................................................16

CONCLUSION ........................................................................19

CERTIFICATE OF COMPLIANCE ......................................................21

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Illinois v. Gates*,
  462 U.S. 213 (1983) ....................................................................5

*Kaley v. United States*,
  571 U.S. 320 (2014) ...................................................................5

*Ornelas v. United States*,
  517 U.S. 690 (1996) ...................................................................5

*People v. McWilliams*,
  524 P.3d 768 (Cal. 2023) ............................................................6

*Samson v. California*,
  547 U.S. 843 (2006) ................................................................7, 9

*Terry v. Ohio*,
  392 U.S. 1 (1968) .......................................................................2

*United States v. Caseres*,
  533 F.3d 1064 (9th Cir. 2008) ....................................................2

*United States v. Davis*,
  932 F.2d 752 (9th Cir. 1991) ......................................................9

*United States v. Estrella*,
  69 F.4th 958 (9th Cir. 2023) .................................................. 4, 12

*United States v. Garcia*,
  974 F.3d 1071 (9th Cir. 2020) ....................................................6

*United States v. Leon*,
  468 U.S. 897 (1984) ...................................................................5

*Utah v. Strieff*,
  579 U.S. 232 (2016) ...................................................................7

**Statutes**

Cal. Penal Code § 3001 .................................................................8

Cal. Penal Code § 3067.................................................................................4

Cal. Penal Code § 3456.................................................................................8

**Regulations**

Cal. Code Regs. tit. 15, § 3600(c)................................................................9

**Other Authorities**

Amanda Charbonneau & Jack Glaser, *Suspicion and Discretion in Policing: How Laws and Policies Contribute to Inequity*, 11 U.C. Irvine L. Rev. 1327 (2021).....................................................14

Andrew Manuel Crespo, *Probable Cause Pluralism*, 129 Yale L.J. 1276 (2020) .....................................................................5

Anthony G. Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn. L. Rev. 349 (1974) ....................................................................5

Cato T. Laurencin & Joanna M. Walker, *Racial Profiling Is a Public Health and Health Disparities Issue*, 7 J. Racial & Ethnic Health Disparities 393 (2020)............................................14

Frank Edwards, Hedwig Lee & Michael Esposito, *Risk of Being Killed by Police Use of Force in the United States by Age, Race-Ethnicity, and Sex*, 116 Proc. Nat'l Acad. Sci. U.S.A. 16793 (2019)....................................15

Gabriel Petek, *The 2023-24 Budget: The California Department of Corrections and Rehabilitation*, Legis. Analyst's Off. (Feb. 2023) ...........................................8

Justin Nix, Bradley A. Campbell, Edward H. Byers & Geoffrey P. Albert, *A Bird's Eye View of Civilians Killed by Police in 2015*, 16 Criminology & Pub. Pol'y 309 (2017)............................................15

Leah Wang, *The U.S. Criminal Justice System Disproportionately Hurts Native People: The Data, Visualized*, Prison Pol'y Initiative (Oct. 8, 2021) .................17

Magnus Lofstrom, Justin Goss, Joseph Hayes & Brandon Martin, *Racial Disparities in California Arrests*, Pub. Pol'y Inst. Cal. (Oct. 2019)....................16

Off. of Rsch., *Summary of Parole Offender Data Points for Month-end July 2023*, Cal. Dep't of Corr. & Rehab. (Aug. 15, 2023) ............................. 13, 17

*QuickFacts California*, U.S. Census Bureau (2022) ................................................17

Racial & Identity Profiling Advisory Bd., *Racial & Identity Profiling Advisory Board Annual Report 2023*, Cal. Dept. of Just. (Jan. 1, 2023) .............13

Raheem Hosseini & Joshua Sharpe, *California Police Officers Have Killed Nearly 1,000 People in 6 Years*, S.F. Chron., Sept. 3, 2022.................................15

Sarah Mehta & Robin Gomila, *Set Up to Fail: Montana's Probation & Parole System*, ACLU Smart Just. Mont. (Sept. 10, 2018) ...............................................17

Stephen J. Schulhofer, *More Essential than Ever: The Fourth Amendment in the Twenty First Century* (2012)...............................................................................5

Stephen Menendian, Samir Gambhir & Arthur Gailes, *Twenty-First Century Racial Residential Segregation in the United States*, U.C. Berkeley Othering & Belonging Inst. (June 21, 2021).........................................................18

Tonja Jacobi, Song Richardson & Gregory Barr, *The Attrition of Rights Under Parole*, 87 S. Cal. L. Rev. 887 (2014) ......................................................................... 9, 10

## STATEMENT OF INTEREST[1]

The American Civil Liberties Union ("ACLU") Foundations of Northern California, Southern California, Alaska, Arizona, Hawai'i, Montana, Nevada, and Oregon are regional affiliates of the ACLU, a national nonprofit, nonpartisan organization dedicated to furthering the principles of liberty and equality embodied in the U.S. Constitution and this Nation's civil rights laws. For decades, these ACLU affiliates have advocated to promote racial justice, to protect the Fourth Amendment rights of the criminally accused, and to advance equal protection for people of color.

The Center on Race, Inequality, and the Law at New York University School of Law ("Center") was created to confront the laws, policies, and practices that lead to the oppression and marginalization of people of color. Among the Center's top priorities is wholesale reform of the criminal legal system, which has, since its inception, been infected by racial bias and plagued by inequality. The Center fulfills its mission through public education, research, advocacy, and litigation, including as amici in numerous federal and state court cases, aimed at cleansing the criminal legal system of policies and practices that perpetuate racial injustice and inequitable outcomes.

---

[1] Amici submit this brief pursuant to Circuit Rule 29-2(a) and state that all parties have consented to its timely filing.

## INTRODUCTION

Suspicionless parole searches are constitutional anomalies that grant the police a license to search individuals absent any indicia of criminal activity. These searches are a necessarily narrow exception to the rule that police must have probable cause, and often a warrant, in order to conduct a search of persons or their property.[2] Yet the Court's new "probable cause" standard for identifying when someone may be subjected to a suspicionless search broadens that exception to unprecedented proportions.

Previously, this Court upheld a standard of actual knowledge for suspicionless parole searches and seizures.[3] This standard was both objective and easy to satisfy: police could acquire actual knowledge of a person's parole status in a matter of minutes or seconds by calling dispatch or checking a police database. But under the panel's lax new standard, police may now subject *anyone* to a suspicionless search, as long as they can assert that they had probable cause to believe that person was on parole at the time of the search. By eliminating the actual knowledge requirement for parole searches, the Court has dramatically expanded the circumstances under

---

[2] Police must have reasonable suspicion of criminal activity to stop a person on the street and must have reasonable suspicion that the person is armed and dangerous to frisk that person for weapons. *See Terry v. Ohio*, 392 U.S. 1, 22-27 (1968).

[3] *See United States v. Caseres*, 533 F.3d 1064, 1075-76 (9th Cir. 2008) (stating that the parole search condition "validates a search only if the police had advance knowledge that the search condition applied before they conducted the search").

which police may conduct warrantless, suspicionless searches of an individual's person and property. In doing so, the Court has abandoned factual verification as the standard for parole-status-based searches in favor of a requirement riddled with police discretion—and all the well-documented racial and ethnic biases that come with the exercise of such discretion.

Amici submit this brief in support of Appellant Christian Alejandro Estrella's petition for *en banc* and panel rehearing in *United States v. Estrella*. Amici offer two overarching arguments in support of the petition. *First*, the new probable cause standard for parole searches threatens to undermine civil liberties for everyone by exposing all members of the public to a heightened risk of suspicionless searches regardless of supervision status. *Second*, the new probable cause standard will entrench and exacerbate racial inequality in the criminal legal system. Specifically, by enhancing police discretion, the standard will facilitate racial profiling and contribute to the over-policing of communities of color in a system already rife with racial inequities. Amici urge the Ninth Circuit to grant the petition in order to reconsider the new probable cause standard for suspicionless parole searches.

# ARGUMENT

## I.     The Probable Cause Standard Will Erode Civil Liberties for Everyone.

Under the California Penal Code, individuals released on parole are subject to searches at any time, by any officer, with or without cause.[4] In the panel opinion, the Court announces a new rule for when police may conduct such suspicionless searches based on parole status. Rather than requiring confirmation of parole status prior to a search, the Court states that "a law enforcement officer must have probable cause to believe that a person is on active parole before he may be detained and searched pursuant to a parole condition."[5] To satisfy this standard, "[i]t is sufficient for the officer to determine, using the well-established rules governing probable cause, that the individual to be detained and searched is on active parole, and that an applicable parole condition authorizes the challenged search or seizure."[6]

In so holding, the Court has significantly relaxed the legal standard for when police in California can conduct a search in the absence of particularized suspicion of criminal activity. This holding expands the suspicionless search exception so broadly that it subverts the basic assumptions of the Fourth Amendment: that persons

---

[4] Cal. Penal Code § 3067.
[5] *United States v. Estrella*, 69 F.4th 958, 961 (9th Cir. 2023).
[6] *Id.*

have a right to live free of government searches and seizures absent some indicia of criminal activity.[7]

**A.** **The Panel Opinion Dramatically Expands the Circumstances Under Which Police Can Conduct Suspicionless Searches.**

Courts, including the U.S. Supreme Court, have long recognized that "probable cause is a fluid concept."[8] Indeed, "[a]rticulating precisely what 'reasonable suspicion' and 'probable cause' mean is not possible."[9] And in fact, "[r]easonable minds frequently may differ on the question whether a particular affidavit establishes probable cause."[10] Fourth Amendment scholars have often bemoaned this opacity, warning against "a [F]ourth [A]mendment with all of the character and consistency of a Rorschach blot"[11] and describing probable cause as "'elusive,' 'hopelessly indeterminate,' and 'shrouded in mystery.'"[12] Amid this amorphousness, however, the Supreme Court has made one thing clear: probable cause "is not a high bar."[13]

---

[7] Stephen J. Schulhofer, *More Essential than Ever: The Fourth Amendment in the Twenty First Century* 66-70 (2012) (describing the U.S. Supreme Court's trend toward deference to police officer authority as counter to the assumptions of the Fourth Amendment).

[8] *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

[9] *Ornelas v. United States*, 517 U.S. 690, 695 (1996).

[10] *United States v. Leon*, 468 U.S. 897, 914 (1984).

[11] Anthony G. Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn. L. Rev. 349, 375 (1974).

[12] Andrew Manuel Crespo, *Probable Cause Pluralism*, 129 Yale L.J. 1276, 1279 (2020).

[13] *Kaley v. United States*, 571 U.S. 320, 338 (2014).

In the panel opinion, the Court supplants the concrete factual standard of actual knowledge of parole status with this malleable and avowedly low standard. As with any probable cause determination, different arbiters will draw different conclusions as to what constitutes "probable cause" to believe someone has the requisite parole status. And because there is no reliable way to know that someone is on parole merely by observing them, the new probable cause standard invites police to fall back on their own biases, stereotypes, and intuitions about the "typical" parolee, including assumptions about the "typical" parolee's race, clothing, criminal history, travel, neighborhood, livelihood, and social life.

Other courts have recognized the dangers of weakening Fourth Amendment protections to facilitate parolee searches. In *People v. McWilliams*, the California Supreme Court recently held that evidence obtained in a parole search was inadmissible because the police illegally detained the parolee before learning of his parole status.[14] There, the court recognized that "a rule permitting officers to rely exclusively on discretionary parole search conditions to purge the taint of unconstitutional, suspicionless detentions would risk creating . . . incentives"[15] for

---

[14] 524 P.3d 768, 770-71 (Cal. 2023); *see also United States v. Garcia*, 974 F.3d 1071, 1073 (9th Cir. 2020).
[15] *McWilliams,* 524 P.3d at 781.

police to conduct stops "in an arbitrary manner" and to treat "members of our communities as second-class citizens."[16]

Amici urge the Court to apply a similarly "careful approach" to the instant case.[17] The U.S. Supreme Court's allowance for suspicionless parole searches in *Samson v. California*[18] constitutes an exception to the general rule against suspicionless searches. But the panel's amorphous probable cause standard eliminates any clear and concrete limit on that exception and thereby expands it, bringing within its orbit groups of people that the parole exception was never designed to exempt from constitutional protection. Furthermore, this expansion reflects an irrational and harmful balancing of interests. The standard trades the privacy interests of parolees and non-parolees alike for an officer's convenience in a non-emergency situation. As a practical matter, this sacrifice is unnecessary, since police can easily verify a person's parole status by calling dispatch or checking a database. Such a lopsided tradeoff needlessly gives police more opportunities to conduct biased, stigmatizing searches without a shred of suspicion of actual criminal activity.

---

[16] *Id.* (quoting *Utah v. Strieff*, 579 U.S. 232, 252 (2016) (Sotomayor, J., dissenting)).

[17] *Id.*

[18] 547 U.S. 843 (2006).

**B.     The Expanded Scope of Parole Searches Will Erode Civil Liberties for Former Parolees, Third Parties, and Entire Communities.**

The panel opinion's dramatic expansion of police power puts (1) former parolees, (2) families and associates of parolees, and (3) members of the broader community at a heightened risk of erroneous police contacts and improper suspicionless searches.

*First*, former parolees enjoy the same Fourth Amendment rights as the general population. But under the panel's new probable cause standard, they face a heightened risk of being subjected to suspicionless searches in contravention of the rights the Fourth Amendment was designed to protect. This risk is particularly acute for people who are discharged from parole early[19] and people whose parole terms are shorter than the state average. According to the Legislative Analyst's budget report, the California parole population is projected to decrease by five percent in the 2023-24 Budget Year (July 2023 to July 2024) "primarily due to recent policy changes that have reduced the length of time people spend on parole by allowing them to be discharged earlier than otherwise."[20] With the average length of time people spend on parole in flux, it is all the more important that police verify parole

---

[19] For state law governing early discharge from supervision, see Cal. Penal Code §§ 3001 & 3456.

[20] Gabriel Petek, *The 2023-24 Budget: The California Department of Corrections and Rehabilitation*, Legis. Analyst's Off., 2 (Feb. 2023), https://lao.ca.gov/reports/2023/4686/CDCR-Budget-021623.pdf.

status before conducting a search or seizure premised on that status. The panel's standard, which does not require factual verification, undercuts the state's promise of full restoration of Fourth Amendment rights after the completion of parole, leaving individuals vulnerable to continued intrusions and thereby undermining their reintegration efforts.

*Second*, the probable cause standard raises the risk of improper suspicionless searches for people who associate with former parolees but are not themselves on parole. Indeed, federal courts have long recognized the potential of parole searches, and in particular searches of parolee residences, to diminish the rights of third parties. This applies most immediately to those who share or spend time in a parolee's home, since police are allowed to search common spaces in the parolee's residence[21] and any items that they reasonably suspect—but do not know—belong to the parolee.[22] As a result, lowering the standard for determining when someone is on parole also jeopardizes the privacy rights of the family and friends of anyone— such as a former parolee—who is mistakenly identified as subject to a parolee search.

---

[21] *See* Cal. Code Regs. tit. 15, § 3600(c); *see also* Tonja Jacobi, Song Richardson & Gregory Barr, *The Attrition of Rights Under Parole*, 87 S. Cal. L. Rev. 887, 908-11 (2014) (arguing that *Samson* eroded the privacy rights of parolees' family members and cotenants).
[22] *See United States v. Davis*, 932 F.2d 752, 758-759 (9th Cir. 1991).

*Third*, under the new standard, members of the broader community will face a heightened risk of warrantless, suspicionless police stops and searches. There is ample evidence that the permissive nature of parole searches already pose a civil rights "hazard" for non-parolees who live in the same neighborhoods as parolees,[23] plausibly because police cast an impermissibly wide net in neighborhoods where they are more likely to encounter parolees. In a study of New York City police statistics, researchers found that police target neighborhoods with a high density of parolees for increased stops and that "[n]onparolees as well as parolees are likely being subjected to increased stops, searches, and arrests."[24] The data indicated that "police are stopping individuals where parolees reside at far greater rates than individuals in parolee sparse districts."[25] Indeed, an increase in the number of parolees in a zip code by just one parolee increases the average number of stops by almost eighteen, which suggests that the policing of parolees has significant spillover effects for the local community.[26] The researchers concluded that the data "shows strong support for the argument that both individual parolees and the community generally are being dramatically affected by the permissive police parolee stop and

---

[23] *See* Jacobi, Richardson & Barr, *supra* note 21, at 942-43.

[24] *Id.* at 974.

[25] *Id.* at 950.

[26] *Id.* at 956-57.

search jurisprudence" and that "the lowered rights of parolees have the effect of diminishing the rights of their neighbors."[27]

Thus, requiring actual verification of active parole status provides critical protection against the further erosion of privacy rights of these communities. The panel's new probable cause standard, by contrast, does just the opposite. By significantly broadening the circumstances under which police are permitted to conduct suspicionless stops and searches without any indicia of criminal activity, the new probable cause standard will sanction and exacerbate the spillover effects documented by researchers. It will undermine the Fourth Amendment rights of people mistaken for, associated with, and living in the same neighborhood as parolees. And, as discussed below, its effects will be felt most acutely in communities of color.

## II. The Standard Will Disproportionately Harm People of Color.

The panel's new probable cause standard for parole searches will disproportionately erode civil liberties for people of color. Because the amorphous standard expands the window of opportunity for police to search or seize individuals absent any indicia of wrongdoing, it will enable racial profiling—whether caused by conscious or unconscious biases—and it will exacerbate the over-policing that communities of color already experience.

---

[27] *Id.* at 957-58.

The new standard will facilitate discriminatory policing in two ways. First, the standard enhances discretion and will therefore amplify the effects of racial bias in policing. By allowing police to omit the simple step of verifying a person's parole status, the standard gives police more latitude to profile, surveil, and harass people of color. Second, because people of color are overrepresented among California parolees, the standard's spillover effects will disproportionately occur in communities of color, producing a starkly disparate impact on the residents of those communities.

### A.    The Panel's Standard Will Exacerbate Racial Profiling in Policing.

The new probable cause standard emphasizes individual discretion over procedural verification. By replacing dispatch calls and database searches with individual memories, assumptions, and biases, the panel's new standard openly invites racial profiling and raises serious constitutional concerns. Contrary to the panel's assertion, the requirement "to verify a parolee's status" before conducting a parole search "guard[s] against" this possibility.[28]

It is well-established that discrimination is rampant in law enforcement. Police officers stop Black people at much higher rates than they stop white people, including in California. An analysis of California stop data from 2021 showed that

---

[28] *Estrella*, 69 F.4th at 971 n.13

officers stopped Black people 144.2 percent *more* often than would be expected based on their share of the population if enforcement were race-neutral, while police stopped white people 11.4 percent *less* often than would be expected.[29] This pattern of racially biased stops extends to parolees. The same study showed that Black people stopped for traffic offenses were 5.2 times more likely to experience a search based only on supervision status than white people.[30] This is an especially striking disparity given that Black people and white people comprise similar shares of the California parole population.[31] A mere fifteen percent of these "supervision only" traffic stops led to the discovery of contraband, with a lower discovery rate in searches of Black and Latine people.[32]

A standard that invites police to initiate suspicionless stops without verifying whether the target is actually on parole will only exacerbate these inequities. Indeed, the connection between police discretion and racial discrimination is likewise well-documented. Research shows that increasing police discretion tends to increase racial disparities in search outcomes. For example, another analysis of California

---

[29] Racial & Identity Profiling Advisory Bd., *Racial & Identity Profiling Advisory Board Annual Report 2023*, Cal. Dept. of Just., 51 (Jan. 1, 2023), https://oag.ca.gov/system/files/media/ripa-board-report-2023.pdf.
[30] *Id.* at 73.
[31] Off. of Rsch., *Summary of Parole Offender Data Points for Month-end July 2023*, Cal. Dep't of Corr. & Rehab., Parole Data Point Header (Aug. 15, 2023), https://public.tableau.com/app/profile/cdcr.or/viz/OffenderDataPoints/SummaryIn CustodyandParole.
[32] Racial & Identity Profiling Advisory Bd., *supra* note 29, at 73.

stop data indicated that comparatively low-discretion searches contributed less to racial disparities than high-discretion searches. Specifically, among lower-discretion searches (e.g., warrant searches), yield rates were generally more consistent across racial groups than yield rates among higher-discretion searches (e.g., *Terry* stops based on perceived threats or weapons).[33] High-discretion weapon searches of white people produced a significantly higher yield rate than such searches of Black and Latine people, suggesting that white people "needed to reach a higher threshold of suspiciousness relative to Black and Latino civilians searched for the same ostensible reason."[34] The researchers suggested that "[c]ognitive biases in perception, attention, and race-weapon associations may be among the causes of these disparities."[35] These findings confirm the close connection between police discretion and discrimination, as well as the dangers of unconscious or implicit bias—whether among police officers or the public at large.

Racial profiling by police causes individual harm and contributes to systemic inequities. The experience of racial profiling can lead to adverse health effects even when it does not lead to physical violence or criminal charges.[36] But in many cases,

---

[33] Amanda Charbonneau & Jack Glaser, *Suspicion and Discretion in Policing: How Laws and Policies Contribute to Inequity*, 11 U.C. Irvine L. Rev. 1327, 1338-42 (2021).

[34] *Id.* at 1341.

[35] *Id.* at 1342.

[36] *See generally* Cato T. Laurencin & Joanna M. Walker, *Racial Profiling Is a Public Health and Health Disparities Issue*, 7 J. Racial & Ethnic Health Disparities

the consequences are more dire. Black and Latine people are consistently overrepresented in use-of-force incidents in California. In 2021, Black people were on the receiving end of 16.7 percent of those incidents, even as they made up only 6.5 percent of the state population.[37] Latine people suffered 50.6 percent of police force while comprising only 40.2 percent of the population.[38] The stakes of these racial disparities could not be higher. Nationally, Black people are more than twice as likely as white people to be unarmed in fatal police shootings,[39] yet a Black man is 2.5 times more likely than a white man to be killed by police.[40] Racial profiling also contributes to downstream disparities in the criminal legal system. A heightened risk of being stopped translates to a heightened risk of arrest, conviction, incarceration, and the myriad collateral consequences that flow from a criminal conviction. An analysis of California arrest data from 2016 showed that Black people

393 (2020) (describing direct and indirect ways that police profiling and racial discrimination adversely affect Black American health).

[37] Raheem Hosseini & Joshua Sharpe, *California Police Officers Have Killed Nearly 1,000 People in 6 Years*, S.F. Chron., Sept. 3, 2022, https://www.sfchronicle.com/sf/article/California-police-violence-17416510.php.

[38] *Id.*

[39] Justin Nix, Bradley A. Campbell, Edward H. Byers & Geoffrey P. Albert, *A Bird's Eye View of Civilians Killed by Police in 2015*, 16 Criminology & Pub. Pol'y 309, 325-27 (2017).

[40] Frank Edwards, Hedwig Lee & Michael Esposito, *Risk of Being Killed by Police Use of Force in the United States by Age, Race-Ethnicity, and Sex*, 116 Proc. Nat'l Acad. Sci. U.S.A. 16793, 16794 (2019).

were three times more likely to be arrested than white people.[41] The arrest rate for Black people was higher than the rate for white people in nearly all California counties; in some counties, it was six times higher.[42]

Because the panel's new standard replaces objective status verification with flawed officer judgment and discretion, it will invite more racial profiling into policing and exacerbate the harms of bias-driven encounters. But the discriminatory effects of the standard do not stop there.

### B. The Standard's Spillover Effects Will Have Compounding Impacts on Already-Overpoliced Communities of Color.

In addition to facilitating direct discrimination against individuals, the probable cause standard will have a broad disparate impact on communities of color. The racial makeup of state parole populations and the persistent patterns of housing segregation in California and nationwide mean that the burdens of the panel's new probable cause standard will fall disproportionately on Black, Latine, and Indigenous individuals *and* communities.

People of color are starkly overrepresented in California's parole population. Black people made up nearly twenty-four percent of California parolees in July

---

[41] Magnus Lofstrom, Justin Goss, Joseph Hayes & Brandon Martin, *Racial Disparities in California Arrests*, Pub. Pol'y Inst. Cal. (Oct. 2019), https://www.ppic.org/wp-content/uploads/racial-disparities-in-california-arrests.pdf.
[42] *Id.*

2023[43] but only 6.5 percent of the state's general population as of July 2022.[44] Latine people are also overrepresented, making up 46.5 percent of California parolees[45] but only around forty percent of the state's general population.[46] By contrast, white people are underrepresented in California's parole population, making up just under twenty-three percent of California parolees[47] and just under thirty-five percent of the state's general population.[48] Because of these racial disparities, California's parole rules, including the panel's new probable cause rule, and their attendant incursions upon constitutional rights and liberties inevitably have a disparate impact on people of color.[49]

---

[43] Off. of Rsch., *supra* note 31.

[44] *QuickFacts California*, U.S. Census Bureau (2022), https://www.census.gov/quickfacts/fact/table/CA.

[45] Off. of Rsch., *supra* note 31.

[46] *QuickFacts California*, *supra* note 44.

[47] Off. of Rsch., *supra* note 31.

[48] *QuickFacts California*, *supra* note 44.

[49] Though California has not published similar data on Indigenous parolees, Indigenous people are overrepresented in the criminal legal system nationwide, including in federal community supervision programs. *See* Leah Wang, *The U.S. Criminal Justice System Disproportionately Hurts Native People: The Data, Visualized*, Prison Pol'y Initiative (Oct. 8, 2021), https://www.prisonpolicy.org/blog/2021/10/08/indigenouspeoplesday. Indigenous people are also overrepresented in the parole systems of Ninth Circuit states such as Montana. *See* Sarah Mehta & Robin Gomila, *Set Up to Fail: Montana's Probation & Parole System*, ACLU Smart Just. Mont., 16 (Sept. 10, 2018), https://www.aclumontana.org/sites/default/files/field_documents/setuptofailmontan asprobationparolesystem.pdf.

Moreover, because California remains residentially segregated by race, the spillover effects of parole searches also disproportionately occur in communities of color. Historical policies such as redlining have contributed to de facto housing segregation in California and nationwide.[50] In California, high levels of racial residential segregation persist, with the Los Angeles-Long Beach-Santa Ana metropolitan area ranking as the nation's sixth most segregated metropolitan area in 2019.[51] And there is little to suggest the forces of segregation are waning: Across the United States, eighty-one percent of metropolitan areas have become more segregated over the last three decades.[52] Given these patterns of residential segregation, any rules that erode constitutional rights for parolees and their communities will necessarily and disproportionately harm communities of color.

Thus, the panel's expansion of police discretion in conducting parole searches will produce commensurately expanded spillover effects across entire communities. It will increase the likelihood that former parolees and parolees' families, friends, and neighbors will be forced to endure police stops and searches absent any indicia of wrongdoing. Police will rely even more on racial biases and stereotypes in

---

[50] Stephen Menendian, Samir Gambhir & Arthur Gailes, *Twenty-First Century Racial Residential Segregation in the United States*, U.C. Berkeley Othering & Belonging Inst., 8, 14 (June 21, 2021), https://belonging.berkeley.edu/roots-structural-racism.
[51] *Id.* at 19-20.
[52] *Id.* at 2.

neighborhoods where more parolees live—effectively placing those communities under a search regime in which they must surrender their privacy to the whims of the police. And because people of color are overrepresented among parolees and often live in racially segregated housing, communities of color will suffer the effects of this expansion most acutely. In short, the panel's opinion weakens constitutional protections in particular places and for particular racial groups, and it compounds the discriminatory over-policing that communities of color already face.

## CONCLUSION

The panel's newly announced probable cause standard dramatically expands the circumstances under which police can stop and search individuals without probable cause or even suspicion that *any* wrongdoing has occurred. By increasing police discretion, this rule will erode Fourth Amendment protections for everyone, invite racial profiling, and exacerbate the already-acute effects of discriminatory policing in overpoliced communities of color. For the reasons stated above, amici encourage the Court to grant the petition for *en banc* and panel rehearing in order to reconsider the probable cause standard for suspicionless parole searches and seizures.

Date:  August 23, 2023          */s/ Shilpi Agarwal*
                                Shilpi Agarwal (Cal. Bar #270749)
                                AMERICAN CIVIL LIBERTIES UNION
                                FOUNDATION OF NORTHERN CALIFORNIA

                                *Counsel for Amici American Civil Liberties Union Foundations*

Date:  August 23, 2023          */s/ Jason D. Williamson*
                                Jason D. Williamson (NY Bar #4645529)
                                CENTER ON RACE, INEQUALITY, AND THE LAW
                                AT NEW YORK UNIVERSITY SCHOOL OF LAW

                                *Counsel for Amicus Center on Race, Inequality, and the Law*

## CERTIFICATE OF COMPLIANCE

I certify that this brief contains 4,135 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6). I further certify that this brief is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

Date:  August 23, 2023

*/s/ Shilpi Agarwal*
Shilpi Agarwal (Cal. Bar #270749)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA

*Counsel for Amici American Civil Liberties Union Foundations*

Date:  August 23, 2023

*/s/ Jason D. Williamson*
Jason D. Williamson (NY Bar #4645529)
CENTER ON RACE, INEQUALITY, AND THE LAW
AT NEW YORK UNIVERSITY SCHOOL OF LAW

*Counsel for Amicus Center on Race, Inequality, and the Law*